Slip Op. 09-152

## UNITED STATES COURT OF INTERNATIONAL TRADE

-------------------------------------------------------x
                                                        :
UNITED STATES STEEL                                     :
CORPORATION,                                            :
                                                        :
            Plaintiff,                                  :
                                                        :
            and                                         :
                                                        :
NUCOR CORPORATION,                                      :
                                                        :
            Plaintiff-Intervenor,                       :
                                                        :
      v.                                                :
                                                        :
UNITED STATES,                                          :
                                                        :
            Defendant.                                  :
_____:      **Before: Judith M. Barzilay, Judge**
                                                        :      **Consol. Court No. 08-00239**
ESSAR STEEL LIMITED,                                    :
                                                        :
            Plaintiff,                                  :
                                                        :
      v.                                                :
                                                        :
UNITED STATES,                                          :
                                                        :
            Defendant,                                  :
                                                        :
            and                                         :
                                                        :
UNITED STATES STEEL                                     :
CORPORATION and NUCOR                                   :
CORPORATION,                                            :
                                                        :
            Defendant-Intervenors.                      :
                                                        :
-------------------------------------------------------x

## OPINION & ORDER

[Plaintiffs' and Plaintiff-Intervenor's Motions for Judgment Upon the Agency Record are granted in part and denied in part.]

Dated:  December, 30 2009

*Skadden Arps Slate Meagher & Flom, LLP* (*Robert E. Lighthizer*, *Jeffrey D. Gerrish*, *Stephen J. Narkin*, and *Nathaniel B. Bolin*), for Plaintiff and Defendant-Intervenor United States Steel Corporation.

*Wiley Rein LLP* (*Alan H. Price* and *Timothy C. Brightbill*), for Plaintiff-Intervenor and Defendant-Intervenor Nucor Corporation.

*Tony West*, Assistant Attorney General; *Jeanne E. Davidson*, Director; *Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*David D'Alessandris*) for Defendant United States; *David Richardson*, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for Defendant.

*Arent Fox LLP* (*Mark P. Lunn* and *Diana Dimitriuc Quaia*), for Plaintiff Essar Steel Limited.

Barzilay, Judge:  Plaintiffs U.S. Steel Corporation ("U.S. Steel") and Essar Steel Limited ("Essar"), as well as Plaintiff-Intervenor Nucor Corporation ("Nucor"), challenge certain aspects of the U.S. Department of Commerce's (the "Department" or "Commerce") administrative review in *Certain Hot-Rolled Carbon Steel Flat Products from India: Final Results of Countervailing Duty Administrative Review*, 73 Fed. Reg. 40,295 (Dep't Commerce July 14, 2008) ("*Final Results*").[1]  Essar points to three alleged errors in Commerce's calculation of the benefit conferred by the Government of India in the subsidies it provided to the company:  (1) the

---

[1] Essar is a manufacturer and exporter of hot-rolled carbon steel flat products from India; U.S. Steel and Nucor produce the subject merchandise in the United States.

agency's use of certain benchmark prices in determining that Essar purchased iron ore lumps and

fines[2] from the National Mineral Development Corporation ("NMDC") for less than adequate

remuneration;[3] (2) the exclusion of the Central Sales Tax from Essar's purchase price for iron ore

lumps and fines from the NMDC; and (3) the decision not to make certain month-end

adjustments to government prices of iron ore lumps and fines in the price comparison.  Essar Br.

8-9.  U.S. Steel and Nucor allege that Commerce erred when it declined to apply facts otherwise

available or adverse inferences with respect to Essar's purported use of, and benefit from, five

new subsidies provided by the Government of India.  U.S. Steel Br. 6-8; Nucor Br. 1-2.  U.S.

Steel and Nucor's remaining claims center on the Department's determination that Essar did not

use those five new programs.  U.S. Steel Br. 14-26; Nucor Br. 4-12.  The court remands the

administrative review results for the reasons explained below.

## I.  Background

### A.  The Calculation of the Benefit Conferred to Essar

On February 2, 2007, the Department initiated the fifth administrative review of the

countervailing duty order on certain hot-rolled carbon steel flat products from India, covering the

period of review from January 1, 2006 to December 31, 2006.  *Initiation of Antidumping and

Countervailing Duty Administrative Reviews and Request for Revocation in Part*, 72 Fed. Reg.

---

[2] Essar uses iron ore lumps and fines – i.e., iron ore in two different forms – to produce the subject merchandise.  Essar Br. 3.

[3] The Government of India holds 98% of the NMDC's shares, and the entity is governed by the nation's Ministry of Steel.  *Certain Hot-Rolled Carbon Steel Flat Products from India: Notice of Preliminary Results of Countervailing Duty Administrative Review*, 73 Fed. Reg. 1578, 1586 (Dep't Commerce Jan. 9, 2008).

5005, 5006 (Dep't Commerce Feb. 2, 2007).  At that time, Commerce provided a copy of the

questionnaire to the Government of India with instructions to transmit certain sections of the

document to the producers and exporters subject to review, including Essar.  Admin. R. Pub.

Doc. ("Pub. Doc.") 9.  One portion of the questionnaire concerned a program under which Essar

obtained iron ore from the Indian government at less than adequate remuneration and which

Commerce had previously found countervailable.

      Commerce published its preliminary findings in January 2008, wherein it found that the

Government of India received less than adequate remuneration for its sales of iron ore lumps and

fines to Essar.  *Certain Hot-Rolled Carbon Steel Flat Products from India: Notice of Preliminary

Results of Countervailing Duty Administrative Review*, 73 Fed. Reg. 1578, 1586-87 (Dep't

Commerce Jan. 9, 2008) ("*Preliminary Results*").  In measuring the adequacy of remuneration,

the Department first looked for actual transaction prices between private parties in India or prices

from sales in government auctions to compare with the prices charged by the Government of

India for sales of lumps and fines to Essar.  *Id*. at 1587 (citing 19 C.F.R. § 351.511(a)(2)(i)).

Commerce determined that the record did not include either of these prices and explained that, in

the absence of market-determined prices, the regulation permits the agency to use world market

prices that purchasers could obtain in India.  *Id*.  The Department then compared the price at

which the Government of India sold iron ore lumps and fines to Essar on an "FOB port" basis[4]

with an average of world market prices available in India for the same products on the same basis

---

[4] The Incoterm "Free on Board ('FOB') port" is a sales term developed by the
International Chamber of Commerce and signifies that a seller delivers an order once the goods
pass the ship's rail at the named port of shipment.

as set forth in the *Tex Report*.[5]  *Id*.  Commerce adjusted the average world market prices to reflect

an iron content consistent with the sales by the Indian government to Essar.  *Id*.  The Department

preliminary concluded that Essar received a countervailable benefit of 6.11% from the

Government of India's sales of high-grade iron ore lumps and fines at less than adequate

remuneration.  *Id*.  Including other subsidies, Commerce calculated Essar's total net

countervailable subsidy rate as 12.87%.  *Id*. at 1598.

After the Department published the *Preliminary Results*, the agency issued supplemental

questionnaires to Essar in which it sought additional information on Essar's purchases of iron ore

lumps and fines, among other data.  Essar provided the requested information regarding a

purchase of iron ore lumps and fines from an unaffiliated supplier located outside of India.

Admin. R. Confidential Doc. ("Conf. Doc.") 44 at 3-5.

On July 14, 2008, the Department published the *Final Results* of its review of the subject

merchandise.  73 Fed. Reg. 40,295.  Commerce found that Essar received a countervailable

benefit of 13.21% for its purchases of iron ore lumps and fines from the Government of India, an

increase of 7.1% over the benefit calculated for those purchases in the *Preliminary Results*.[6]

*Issues and Decision Memorandum: Final Results of Administrative Review*, C-533-821 (Dep't

Commerce July 7, 2008), Pub. Doc. 292 at 16 ("*Issues and Decision Memorandum*").  In so

_____

[5] The *Tex Report* is a daily Japanese publication that reports on world-wide prices for iron ore.  *Preliminary Results*, 73 Fed. Reg. at 1587.  Both the Government of India and Essar submitted copies of several issues of the *Tex Report* in November 2007 that included iron ore prices from Australian and Brazilian producers, as well as Japanese and European steel makers. *Id*. at 1587 n.20.

[6] Consequently, the total net countervailable subsidy rate applicable to Essar increased from 12.87 to 17.50%.  *Final Results*, 73 Fed. Reg. at 40,297.

doing, the agency changed the benchmark prices it used in the *Preliminary Results* to determine

whether the Government of India's sales of iron ore lumps and fines were for less than adequate

remuneration. In the *Preliminary Results*, Commerce used an average of the world market prices

in the *Tex Report* for iron ore lumps and fines in India, which included Government of India

prices from Baidalia and Donimalai, India and import prices from Hamersley, Australia. *Issues*

*and Decision Memorandum* at 33 & n.9. For the *Final Results*, the Department stated that the

pertinent regulation favored the use of the actual transaction price at which Essar purchased iron

ore lumps from an unaffiliated private supplier as the benchmark price to measure the adequacy

of remuneration for Essar's purchases of iron ore lumps from the Government of India. *Id*. at 33-

34. Commerce reasoned that because Essar provided information on those actual purchases after

the *Preliminary Results*, that data would be used in the agency's final determination. *Id*. With

respect to purchases of iron ore fines, the agency limited the benchmark price to offers for sale in

India of iron ore fines from Hamersley, Australia found in the *Tex Report*. *Id*. at 33-34 & n.9.

The Department explained that it declined to use the Government of India's prices for iron ore

fines in establishing the benchmark price because those sales were made by the NMDC, "the

very government provider of the good at issue." *Id.* at 33. To ensure comparability between the

two prices, Commerce adjusted the benchmarks to reflect a price that would be paid if the

product were imported into India, including the duties and delivery charges necessary to deliver

the product to the factory gate. *Id*. at 35-36 (citing § 351.511(a)(2)(iv)). Commerce also found

that the record did not contain data concerning duties and taxes on imports, and therefore it

excluded the Central Sales Tax from Essar's purchases from the NMDC. *Id*. at 36. Finally, with

regard to Essar's purchases of iron ore fines, the Department declined to make certain month-end

adjustments Essar requested, because the data was incomplete and Essar failed to support its

request with the necessary information.  *Id*. at 38.

## B.  The Five New Countervailable Programs

In May 2007, U.S. Steel submitted a timely allegation that Essar had received actionable

benefits under previously unexamined programs promulgated under (1) the Special Economic

Zone Act of 2005, (2) the State of Gujarat Special Economic Zone Act, (3) the State of Gujarat

Captive Ports Program, (4) the State of Andhra Pradesh Industrial Policy, and (5) the State of

Chhattisgarh Industrial Policy.  Pub. Doc. 48 at 1-2.  On October 4, 2007, Commerce initiated its

investigation into the newly alleged subsidies.  Pub. Doc. 97.  The Department sent the

Government of India and the relevant state governments a questionnaire requesting information

on these alleged subsidy programs, including Essar's use and receipt of benefits under them.

Pub. Doc. 101.  The Indian government initially responded that Essar had provided the necessary

information and that it had nothing to add.  Pub. Doc. 151 at 1.  The Department sent the Indian

government another copy of the questionnaire and explained that the questions addressed to the

foreign government were distinct from those contained in the questionnaires sent to Essar.  Pub.

Doc. 163 at 1.  Commerce also warned that the Government of India's failure to respond could

result in the application of adverse facts available with respect to the countervailability of those

programs.  Pub. Doc. 163 at 1.  Neither the Government of India nor the relevant Indian state

governments submitted responses to the questionnaires, despite having requested and received

three extensions of time to file their answers.  Pub. Docs. 163, 166.  Essar submitted its response

to the questionnaire and stated that it did not use any of the newly alleged subsidy programs.

Pub. Doc. 138 at 1-14.

In the *Preliminary Results*, the Department partially resorted to adverse facts available

because the Government of India and relevant state governments did not respond to the agency's

October 2007 questionnaire by the established deadline. *Preliminary Results*, 73 Fed. Reg. at

1581. Consequently, the agency found that the programs constituted government financial

contributions that were specific to the hot-rolled steel industry. *Id*. at 1581. However,

Commerce relied upon Essar's specific responses to the questionnaire to determine that the

company did not use, and therefore did not receive a benefit from, any of those five programs.

*Id*. at 1597-98. The Department did not articulate the basis for its determination of non-use, but

it did invite interested parties to comment for the final results on whether it would be "more

appropriate to use facts available in determining to what extent Essar . . . may have benefitted

from these newly alleged programs." *Id*. at 1581 n.9.

In response to the Department's request in the *Preliminary Results*, U.S. Steel submitted a

brief to Commerce in which it argued that the agency should apply adverse inferences and find

that Essar used, and therefore benefitted from, the newly alleged government programs. Pub.

Doc. 270. U.S. Steel reasoned that certain facts – (1) Essar's unreliable responses of non-use and

(2) the Government of India and the respective state governments' failure to respond to the best

of their abilities to Commerce's requests for information on the new programs – warranted the

adverse inferences. Pub. Doc. 270 at 5-21.

In the *Final Results*, Commerce affirmed that it should apply adverse inferences and find that the newly alleged programs were government financial contributions specific to the hot-rolled steel industry because the Government of India and relevant state governments failed to respond to the agency's questionnaires. *Issues and Decision Memorandum* at 5. However, the Department still found that it was appropriate to rely on Essar's questionnaire responses with regard to the benefits for each program rather than resort to facts otherwise available or adverse inferences. *Id*. at 41-43 (citing *Countervailing Duty New Shipper Review: Certain In-shell Roasted Pistachios from the Islamic Republic of Iran*, 73 Fed. Reg. 9993 (Dep't Commerce Feb. 25, 2008); *Stainless Steel Sheet and Strip in Coils from the Republic of Korea: Final Results of Countervailing Duty Administrative Review*, 73 Fed. Reg. 2456 (Dep't Commerce Jan. 15, 2008); *Final Results of Countervailing Duty Administrative Review: Certain In-shell Roasted Pistachios from the Islamic Republic of Iran*, 71 Fed. Reg. 27,682 (Dep't Commerce May 12, 2006)). Commerce reviewed the comments received on each of the findings of non-use of the five alleged subsidy programs and found that Essar did not use any of those programs. *Id*. at 45-49.

## II. Subject Matter Jurisdiction & Standard of Review

Pursuant to 28 U.S.C. § 1581(c), the Court has exclusive jurisdiction over any civil action commenced under section 516A of the Tariff Act of 1930, which provides for judicial review of, among other proceedings, the Department's administrative review of a countervailing duty order. 19 U.S.C. § 1516a(a)(2)(B)(iii). In reviewing Commerce's determinations, the Court will hold

unlawful any conclusion "unsupported by substantial evidence on the record, or otherwise not in

accordance with law." § 1516a(b)(1)(B)(i).

Substantial evidence on the record constitutes "less than a preponderance, but more than a

scintilla." *Novosteel SA v. United States*, 25 CIT 2, 16, 128 F. Supp. 2d 720, 725 (2001)

(quotation marks & citation omitted), *aff'd*, 284 F.3d 1261 (Fed. Cir. 2002). The Department

must support its determination with such relevant evidence that "a reasonable mind might accept

as adequate to support a conclusion" in light of the entire record, including "whatever fairly

detracts from the substantiality of the evidence." *Atl. Sugar, Ltd. v. United States*, 744 F.2d

1556, 1562 (Fed. Cir. 1984) (quotation marks omitted). This standard necessitates that the

agency thoroughly examine the record and "articulate a satisfactory explanation for its action

including a rational connection between the facts found and the choice made." *Motor Vehicle

Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation marks

omitted); *accord Bando Chem. Indus., Ltd. v. United States*, 16 CIT 133, 136, 787 F. Supp. 224,

227 (1992). The possibility of drawing two inconsistent conclusions from the evidence does not

preclude Commerce's ruling from being supported by substantial evidence. *Thai Pineapple Pub.

Co. v. United States*, 187 F.3d 1362, 1365 (Fed. Cir. 1999); *Novosteel SA*, 25 CIT at 12, 128 F.

Supp. 2d at 730.

To ascertain whether a particular agency determination is in accordance with law, the

Court applies the two-step test articulated by the Supreme Court in *Chevron U.S.A., Inc. v.

Natural Resources Defense Council*. 467 U.S. 837 (1984). The court first examines whether

Congress has spoken directly to the question at hand. If Congress's intent is clear, then the court

and the agency must give effect to that "unambiguously expressed" purpose. *Id.* at 843. Only

where the court finds the relevant statute ambiguous or silent with respect to the specific issue

must it defer to the Department's reasonable interpretation of the underlying law. *See id.* This

deference extends to technical methodologies that Commerce may apply to fulfill its statutory

mandate. *Thai Pineapple Pub. Co.*, 187 F.3d at 1365 ("The methodologies relied upon by

Commerce in making its determinations are presumptively correct."); *see Hynix Semiconductor,*

*Inc. v. United States*, 29 CIT 995, 1000, 391 F. Supp. 2d 1337, 1342 (2005).

### III.  Discussion

## A.  The Department's Calculation of the Benefit Conferred to Essar by the Government of India in Sales of Iron Ore Lumps and Fines

Essar challenges several aspects of the Department's conclusion that the Government of

India received less than adequate remuneration for its sales of iron ore lumps and fines to the

company. The court affirms in part and remands in part Commerce's determination on this issue.

### 1.  The Statutory Framework for the Calculation of a Subsidy

The purpose of the countervailing duty regime is to "impose additional duties on

imported products which are subsidized by the country of export or manufacture." *Wolff Shoe*

*Co. v. United States*, 141 F.3d 1116, 1117 (Fed. Cir. 1998). The Department levies

countervailing duties on those subsidized imports to "offset the unfair competitive advantages

created by the foreign subsidies." *Id.* at 1116 (footnote omitted). By statute, Commerce must

discern whether the foreign government subsidized the subject imports, and the U.S.

International Trade Commission must establish whether those imports cause or threaten an industry in the United States with material injury.  19 U.S.C. § 1671(a).

A subsidy occurs when a foreign government provides a financial contribution to a specific industry and a recipient within the industry receives a benefit as a result of that contribution.  *Id.* § 1677(5)(B).  One type of countervailable subsidy is a foreign government's sale of goods for less than adequate remuneration to a company within a particular industry. § 1677(5)(D)(iii), (E)(iv).  The Department determines the adequacy of remuneration by comparing the government price with a market-determined price for such goods in the country subject to the review.[7]  § 1677(5)(E).  Expanding on this statutory directive, Commerce uses a three-tiered hierarchy of benchmarks in its price comparison.  § 351.511(a)(2).  The first and preferred benchmark is a market-determined price arising from actual transactions of the same good in the country being reviewed, and that price may stem from "actual transactions between private parties, actual imports, or, in certain circumstances, actual sales from competitively run government auctions."  § 351.511(a)(2)(i).  In the event that no market-determined price is available, the agency will compare the government price to a world market price "where it is reasonable to conclude that such price would be available to purchasers in the country in question."[8]  § 351.511(a)(2)(ii).  In using either (1) an actual transaction price or (2) a world market price as the benchmark in its price comparison, Commerce will adjust the benchmark "to

---

[7] The relevant factors affecting market conditions within that country include "price, quality, availability, marketability, transportation, and other conditions of purchase or sale." § 1677(5)(E).

[8] Commerce averages world market prices where more than one is available, "making due allowance for factors affecting comparability."  § 351.511(a)(2)(ii).

reflect the price that a firm actually paid or would pay if it imported the product" and include

"delivery charges and import duties" where appropriate. § 351.511(a)(2)(iv). Only when no

world market price is available to purchasers in the country subject to the review will the

Department "measure the adequacy of remuneration by assessing whether the government price

is consistent with market principles." § 351.511(a)(2)(iii).

   **2. The Department's Calculation of the Benchmark Prices for Iron Ore Lumps and Fines**

      In the *Final Results*, the Department used the actual transaction price at which Essar

purchased iron ore lumps from an unaffiliated private supplier outside of India as the benchmark

in its price comparison to determine whether the Government of India received less than

adequate remuneration. *Issues and Decision Memorandum* at 33-34. As the benchmark for iron

ore fines, Commerce used the *Tex Report* offers for sale in India of iron ore fines from

Hamersley, Australia. *Id.* at 33-34 & n.9. Essar contends that the Department acted contrary to

law because it did not use actual transaction prices of iron ore lumps and fines between the

Government of India and Japanese customers as the benchmarks in measuring whether Essar's

purchases from the Indian government were for adequate remuneration, as the agency did in

previous administrative reviews. Essar Br. 17-24. Essar alleges that Commerce failed to

adequately explain this departure. Essar Br. 15-17. Essar also complains that physical

differences and other dissimilar conditions of sale prevent a fair comparison between the iron ore

lumps and fines offered by the Government of India, on the one hand, and iron ore lumps from an

unaffiliated foreign supplier and Australian iron ore fines, on the other.[9]  Essar Br. 24-30.

Finally, Essar avers that the agency should adjust the benchmark prices for iron ore lumps and

fines to reflect the same terms of delivery as the Indian government's prices.  Essar Br. 26-28,

30-34.  More specifically, Essar argues that Commerce should compare prices on an ex-mine

basis and should exclude freight and delivery charges from the comparison.  Essar Br. 26-28, 30-

34.

       The Department did not err in its calculation of the benchmark for iron ore lumps.

Pursuant to § 351.511(a)(2)(i), Commerce used the preferred benchmark in its price comparison

of iron ore lumps – "a market-determined price resulting from actual transactions in the country

in question."  *Issues and Decision Memorandum* at 34.  It is undisputed that subsequent to the

publication of the *Preliminary Results*, Essar submitted data on its actual purchases of iron ore

lumps from an unaffiliated foreign company.  *Id*.  Essar fails to demonstrate that the prices

offered by the NMDC, a government authority under § 1677(5)(B), reflect "actual transactions

between private parties, actual imports, or, in certain circumstances, actual sales from

competitively run government auctions."  § 351.511(a)(2)(i).  First, the NMDC prices for iron ore

lumps are export prices to Japan and are not reflective of a market-determined price for the good

resulting from actual transactions in India.  Second, the NMDC, as a government authority, is

---

[9] Essar's claim that the dissimilar conditions of sale prevent a fair comparison between the two benchmarks and the NMDC prices is not persuasive.  That the sales terms were different in each transaction does not foreclose Commerce from using the non-NMDC prices, nor does it suggest that the NMDC prices were market-derived.  In fact, no language in the controlling regulation limits the Department's comparison to prices made under identical sales terms.  To read that limitation into the law would undermine the efficacy of the countervailing duty regime.  *See Wolff Shoe Co.*, 141 F.3d at 1117.

free from normal profit-maximization pressures, and it may make pricing decisions based on other, non-commercial criteria.[10]  The Department has stated that "actual sales from government-run competitive bidding" may constitute a market-determined price based on actual transactions in the country subject to review and therefore may be used as a benchmark price if the foreign sovereign "sells a significant portion of the goods . . . through competitive bid procedures that are open to everyone, that protect confidentiality, and that are based solely on price." *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,377 (Dep't Commerce Nov. 25, 1998).  However, no evidence in the record suggests that the NMDC prices resulted from competitive bid procedures that were open to all consumers, protected confidentiality, and based solely on price.  Moreover, using the NMDC prices in this review illogically would require Commerce to compare one Government of India price to another.  Finally, Essar's submission of its actual purchases of iron ore lumps from an unaffiliated foreign company during the period of review is a unique fact absent from previous administrative reviews that justifies Commerce's use of a different benchmark.  *See Peer Bearing Co.-Changshan v. United States*, 32 CIT ___, ___, 587 F. Supp. 2d 1319, 1325 (2008) (explaining that "each administrative review is a separate segment of proceedings with its own unique facts" (quotation marks omitted)).

Similarly, Commerce's use of the Hamersley, Australia prices as the benchmark for iron ore fines is not contrary to law.  After establishing that no actual transaction prices were

---

[10] Essar also claims that the NMDC's profitability demonstrates that it does not provide Essar with iron ore lumps at less than adequate remuneration.  Essar Br. 22.  The overall profitability of the NMDC does not demonstrate that its prices to Essar are market-based.  The NMDC could walk the line between maximum profitability and bankruptcy without charging market-based rates, especially since the government entity has access to capital and other resources that are not otherwise available to private competitors.

available, the Department acted pursuant to the pertinent regulation and used the only world

market price available in India on the record – iron ore fine prices from Hamersley. *Issues and*

*Decision Memorandum* at 33 n.9. The agency explained that it would limit the benchmark prices

derived from the *Tex Report* and use only Hamersley prices because the other prices listed in that

report were from the NMDC, "the very government provider of the good at issue." *Id.* at 33.

The reasoning behind Commerce's decision to limit the benchmark price for iron ore fines to the

Hamersley price echoes the same concerns the United States raised with respect to the use of the

NMDC prices of iron ore lumps, namely, that the comparison of NMDC to NMDC prices would

be a meaningless measure of the adequacy of remuneration. *See id*. Notwithstanding Essar's

assertions to the contrary, there is no indication that the NMDC's prices of iron ore fines are

representative of either (1) "actual transactions between private parties, actual imports, or, in

certain circumstances, actual sales from competitively run government auctions" or (2) a market-

determined price available to purchasers in India and, therefore, must be used as the benchmark.

§ 351.511(a)(2)(i)-(ii).

Additionally, the Department's decision to eliminate the NMDC price from the world

market price benchmark for iron ore fines is not contrary to law. Commerce acted in accordance

with § 351.511(a)(2) when it used a world market price as the benchmark after finding no

market-determined prices based on actual transactions in India. *Id.* Essar also fails to

acknowledge that Commerce did not establish a benchmark price for iron ore fines in its previous

administrative review, given Essar's claim that it purchased only iron ore lumps from the

NMDC. *See Issues and Decision Memorandum:  Final Results of Administrative Review of the*

*Countervailing Duty Order on Certain Hot-Rolled Carbon Steel Flat Products from India*, C-533-821 (May 10, 2006) at 4, *available at* http://ia.ita.doc.gov/frn/summary/india/E6-7506-1.pdf. For these reasons, the Department's decision to use only the Hamersley price as the benchmark for iron ore fines is in accordance with law.

Essar also failed to exhaust administrative remedies with regard to its claim that Australian iron ore fines are not comparable to the fines sold by the NMDC. The Court requires litigants in countervailing duty proceedings to exhaust administrative remedies "where appropriate," 28 U.S.C. § 2637(d), in part so that the Court does not usurp the agency's powers by setting aside an "[agency] determination upon a ground not theretofore presented and deprive[] the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action." *Unemployment Comp. Comm'n of Territory of Alaska v. Aragan*, 329 U.S. 143, 155 (1946) (footnote omitted). Exhaustion is almost always appropriate in the countervailing duty context because "it allows the agency to apply its expertise, rectify administrative mistakes, and compile a record adequate for judicial-review." *Carpenter Tech. Corp. v. United States*, 30 CIT 1373, 1374-75, 452 F. Supp. 2d 1344, 1346 (2006). Commerce used the Hamersley price in the *Preliminary Results* and Essar did not object to its use at the administrative level on the basis that it was not a comparable product. Thus, because Essar failed to exhaust its administrative remedies, this issue is not ripe for judicial review. *See id.*

Finally, Commerce properly included freight and delivery charges in the benchmark prices. When the Department uses either (1) an actual transaction price or (2) a world market price as the benchmark in its price comparison, it adjusts the benchmark "to reflect the price that

a firm actually paid or would pay if it imported the product" and adds the applicable "delivery

charges and import duties."  § 351.511(a)(2)(iv).  This practice ensures that the Department

engages in a fair comparison between the government price and the price that a company "would

pay if it imported the product."  *Id*.  To calculate the price that a company would pay if it

imported the good, Commerce must assume that there are no cheaper, domestic market-based

alternatives of the same good available to the consumer.  *See id*.  The cost of having a foreign

product available in India necessarily includes the applicable "delivery charges and import

duties."  *Id*.  It would be inconsistent with law to make the comparison on an ex-mine basis, as

Essar requests, because to do so would offend § 351.511(a)(2)(iv) and not accurately represent

the price a firm would pay if it had imported the product in India.  Thus, Commerce did not err

when it included delivery charges and import duties in its calculation of the benchmark prices for

iron ore lumps and fines.

### 3.  The Department's Calculation of the Government of India's Prices for Iron Ore Lumps and Fines

Essar challenges two aspects of Commerce's calculation of the Government of India's

prices used in the comparison to measure the adequacy of remuneration.  First, Essar contests the

Department's decision not to include the Central Sales Tax in the price that Essar paid to the

Government of India for iron ore lumps and fines.  Essar Br. 34-35.  Emphasizing that the

Central Sales Tax is a cost incurred by the company in purchasing from the NMDC, Essar

contends that the deduction "created a distortion where none previously existed" and that the tax

must be included to ensure a fair comparison.  Essar Br. 34-35.  Second, Essar argues that

Commerce should have made certain end-of-the-month adjustments to the company's iron ore

lump and fine purchases from the NMDC, as Commerce did in the *Preliminary Results*.  Essar

Br. 35-37.  Essar avers that the Department did not ask any questions about the adjustment

information or indicate that the information provided was deficient, and therefore the agency

acted contrary to 19 U.S.C. § 1677m(d).

The Department did not support its decision to deduct the Central Sales Tax from the

government price with substantial evidence.  After acknowledging that it made certain

adjustments to the benchmark price to ensure a fair comparison, *Issues and Decision*

*Memorandum* at 35-36, Commerce reasoned that it should exclude the Central Sales Tax from

the government price "because the import duties for imports of iron ore are not on the record"

and, therefore, the agency was "not able to adjust the benchmark price to include import duties

and any other taxes payable on imports of iron ore." *Id*. at 36.  Commerce does not explain why

this particular deduction is an adequate substitute for an adjustment to the benchmark price.  The

Department also failed to provide a logical explanation as to why the deduction of the Central

Sales Tax, as opposed to some other deduction from the government price, resulted in a more

appropriate comparison.  *See id*. at 34-36.  Because the agency's decision fails to demonstrate "a

rational connection between the facts found and the choice made," the court remands the issue

for the agency to explain its position or take other action.  *Motor Vehicle Mfrs. Ass'n of the U.S.,*

*Inc.*, 463 U.S. at 43 (quotation marks omitted).

Commerce properly disregarded Essar's claimed adjustments to the iron ore lumps and

fines prices charged by the NMDC.  The respondent bears the burden of creating an adequate

record in a countervailing duty proceeding.  *SKF USA Inc. v. United States*, 29 CIT 969, 977, 391

F. Supp. 2d 1327, 1334 (2005) (citing *Tianjin Mach. Imp. & Exp. Corp. v. United States*, 16 CIT

931, 936, 806 F. Supp. 1008, 1015 (1992)).  When Commerce determines that a response to an

information request fails to comply with that request, the Department must promptly inform the

party submitting the response "of the nature of the deficiency" and provide that party "with an

opportunity to remedy or explain the deficiency in light of the time limits established."

§ 1677m(d).  If the party submits additional information in response to the Department's request

and the response is either (1) unsatisfactory or (2) untimely, then the agency may disregard the

subsequent responses, subject to certain conditions in § 1677m(e).[11]  *Id.*

In its initial response to the Department's countervailing duty questionnaire, Essar

reported the quantity and value of its purchases of iron ore lumps and fines from the NMDC on a

transaction-specific basis in a spreadsheet.  Conf. Doc. 2 at Ex. 8; Pub. Doc. 37 at Ex. 8.  For

some of these transactions, Essar included certain non-quantitative data under the "amount"

column.  Conf. Doc. 2 at Ex. 8; Pub. Doc. 37 at Ex. 8.  In the *Preliminary Results*, the

Department measured the adequacy of remuneration and calculated the benefit from the sale of

iron ore fines by the NMDC using certain cumulative numbers provided by Essar, not the

individual transactions reported as separate line items in the company's spreadsheet.  Conf. Doc.

---

[11] The Department must consider information submitted by an interested party that is
necessary to the determination in administrative review, but that fails to meet the relevant
submission requirements, if:  (1) the submission is timely; (2) the information therein is
verifiable; (3) the submitted information is reliable; (4) the interested party acted to the best of its
ability to satisfy the relevant submission requirements; and (5) the information can be used
without undue difficulty.  § 1677m(e).  This provision is inapplicable to the facts of this case, as
Commerce did not state that Essar's responses were unsatisfactory, but instead found the
information to be irrelevant to the agency's analysis.  *Issues and Decision Memorandum* at 38.

38 at 10-11.  Subsequently, Commerce issued a supplemental questionnaire in which it instructed

Essar to answer, among other questions, what was included in the "amount" column of its

spreadsheet detailing purchases of iron ore fines.  Pub. Doc. 218 at 4.  Specifically, Question 12

asked Essar to "clarify the basis of th[e] price, FOB port, FOB mine, or some other basis," listed

in the "amount" column.  Pub. Doc. 218 at 4.  In response, Essar reported that "[i]n the case of

fines, the amount 'column' includes ex mine price[s], cess [sic], royalty, local sale[s] tax[es] and

port expenses if any."  Pub. Doc. 242 at 7.  Essar did not explain the significance or nature of the

non-quantitative data associated with certain transactions under the "amount" column, nor did

Essar identify these figures as adjustments.  In other words, Essar did not clarify how it

calculated the amounts for iron ore fines and which components represented those amounts.

That the agency did not act upon unexplained information or read the data as Essar would have

preferred does not mean that the company failed to respond to the Department's questions or that

Commerce determined that Essar failed to so respond.  *See Issues and Decision Memorandum* at

38.  The agency simply disregarded certain claimed adjustments to Essar's purchases of iron ore

fines when the company failed to provide any basis for those adjustments, a decision well within

the agency's discretion.  *See Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir.

1996) (explaining that Court grants "tremendous deference" to Commerce's final countervailing

duty determinations due to technical and complex decisions involved); *accord Thai Pineapple*

*Pub. Co.*, 187 F.3d at 1367.

      Finally, the United States requests a voluntary remand to adjust the government price for

the following reasons:  (1) to correct its admittedly erroneous freight calculations for Essar's

purchases of iron ore fines from the NMDC and (2) to account for slurry pipe transportation costs

to Vizag in those calculations.  Def. Br. 38.  The court considers the Government's request for a

voluntary remand under the framework established in *SKF USA Inc. v. United States*, 254 F.3d

1022, 1027-30 (Fed. Cir. 2001).  In that case, the Federal Circuit held that a voluntary remand "is

required, absent the most unusual circumstances verging on bad faith" when, *inter alia*, the

agency requests a remand "because it believes that its original decision is incorrect on the merits

and wishes to change the result." *Id.* at 1030.  The court discerns no evidence of bad faith on the

record and grants the Government's request so that it may correct its freight calculations for

Essar's purchases of iron ore fines from the NMDC.

**B.  The Department's Conclusion That Essar Did Not Use Certain Countervailable**

**Programs**

As previously explained, a subsidy occurs when a foreign government provides a

financial contribution to a specific industry and a recipient within the industry receives a benefit

as a result of that contribution.  § 1677(5)(B).  Commerce must demonstrate that the recipient

availed itself of the financial contribution in such a way that it used the government program at

issue and received a benefit thereunder. *See id.*  To make the "benefit" finding, among others,

the Department solicits information from both the foreign government and the respondent

companies that are alleged to have received benefits from the programs.  § 351.221(b).  U.S.

Steel and Nucor challenge (1) Commerce's decision not to apply facts otherwise available or

adverse inferences because the Government of India and certain state government failed to

respond to the agency's questionnaires, and (2) the Department's conclusion that Essar did not

use, and therefore benefit from, five certain programs within India.  U.S. Steel Br. 8-28; Nucor

Br. 4-14.  The court affirms in part and remands in part Commerce's conclusions on these issues.

### 1.  The Decision to Not Apply Facts Otherwise Available or Adverse Inferences

In the *Final Results*, Commerce applied adverse inferences to the "financial contribution"

and "specificity" elements of a countervailable subsidy because of the Indian national and state

governments' failure to respond to the agency's questionnaire.  *Issues and Decision*

*Memorandum* at 5.  However, the agency declined to apply facts otherwise available or adverse

inferences with respect to the third element – benefit.  *Id*. at 5, 38-43.  U.S. Steel and Nucor

argue that the refusal of the national and state governments of India to answer Commerce's

questionnaire on the newly alleged subsidies is sufficient grounds for the application of facts

otherwise available or adverse inferences with respect to Essar's use of and benefit from the five

newly alleged programs.  U.S. Steel Br. 8-14; Nucor Br. 12-14.  U.S. Steel avers that

Commerce's regulations and publications emphasize that "a foreign government's response [is]

critically important to the [agency's] accurate investigation of countervailable subsidies and . . . a

respondent company bears a burden to ensure that such response is provided."  U.S. Steel Br. 10.

To allow otherwise, U.S. Steel and Nucor contend, would cause Commerce to "cede control over

the investigative process to the respondents."  U.S. Steel Br. 10.  As a result, the domestic

interested parties claim that 19 U.S.C. § 1677e compels the Department to apply other available

facts or adverse inferences when a foreign government fails to respond to an agency

questionnaire.[12]  U.S. Steel Br. 10-14; Nucor Reply 13-15.

---

[12] U.S. Steel also points to the Indian national and state governments' refusal to answer
certain questionnaires in the sixth administrative review of the subject merchandise as proof that

      The Department acted in accordance with law and supported its decision not to apply

adverse inferences with substantial evidence.  Commerce must apply facts otherwise available

when necessary information is not available on the record or if "an interested party or any other

person" commits one of the following acts:  (1) withholds information that has been requested by

the agency; (2) fails to provide timely information, subject to certain conditions; (3) significantly

impedes an administrative proceeding; or (4) provides unverifiable information.  § 1677e(a).

Contrary to Nucor's claim, Commerce's actions comported with these requirements, as the

agency used information otherwise available – i.e., the data submitted by Essar on its use of and

benefit from the five programs – after the Indian national and state governments failed to respond

to the agency's questionnaires.  *Issues and Decision Memorandum* at 41-43.  Only when the

Department finds that an interested party failed to cooperate by not "acting to the best of its

ability" to comply with the agency's request for information *may* Commerce use adverse

inferences.  § 1677e(b).  This provision does not contain clear, unambiguous language that

compels the Department to automatically apply adverse inferences whenever a foreign

government fails to respond to an agency questionnaire, *id.*, and therefore U.S. Steel and Nucor's

argument must fail.  Moreover, Commerce reasoned that its decision to use Essar's submitted

information was appropriate under the facts of the case, given that the agency does not apply

adverse inferences when a respondent "can establish non-use of a program as a factual matter,

without an accompanying or complete government response."  *Issues and Decision*

_____

the Department should apply adverse inferences in this review.  This argument is unpersuasive
for reasons previously explained.  *See Peer Bearing Co.-Changshan*, 32 CIT at ___, 587 F.
Supp. 2d at 1325.

*Memorandum* at 42 (citation omitted). The Department found that Essar's responses adequately

established non-use. *Issues and Decision Memorandum* at 43-49. This rational justification

prevents the court from disturbing this lawful decision. *See Motor Vehicle Mfrs. Ass'n of the*

*U.S., Inc.*, 463 U.S. at 43.

    **2. The Special Economic Zone Act of 2005 & the State of Gujarat Special Economic**

**Zone Act**

    In the proceeding below, Commerce determined that Essar did not use either the Special

Economic Zone Act of 2005 or the State of Gujarat Special Economic Zone Act during the

period of review.[13] *Issues and Decision Memorandum* at 44-46. The Department concluded that

Essar did not use the former, because (1) Essar reported, and Commerce countervailed, all of the

licenses that the company received under another program, the Export Promotion of Capital

Goods Scheme ("EPCGS"), covering duty free imports of capital goods used in the special

economic zone during the period of review; (2) Essar asserted in its questionnaire that it was in

---

    [13] The benefits provided by the Special Economic Zone Act of 2005 include (1) the duty free import of goods and services for the development, operation, and maintenance of special economic zone units; (2) an exemption from excise duties on goods brought from the Domestic Tariff Area of India (i.e., the whole of India, excluding special economic zones) for use by an enterprise in the special economic zone; (3) drawback on goods brought or services provided from the Domestic Tariff Area into a special economic zone, or services provided in a special economic zone by service providers located outside of India; (4) a full exemption from income taxes on export income for the first five years of operation; (5) an exemption from the Central Sales Tax; and (6) an exemption from the National Service Tax. *Issues and Decision Memorandum* at 28-29. The State of Gujarat Special Economic Zone Act provides exemptions from (1) stamp duty and registration fees for land transfers, loan agreements, credit deeds, and mortgages; (2) sales taxes, purchase taxes, and other taxes payable on sales and transactions; and (3) sales and other state taxes on purchases of inputs (both goods and services) for the special economic zone or a unit within that zone. *Id*. at 31.

the process of building facilities in the special economic zone and that it exported no

merchandise from the special economic zone during the period of review; and (3) Essar's

financial statement explained that the company qualified for benefits under the program in

January 2007 subject to certain conditions which were met in March 2007, dates falling outside

of the period of review. *See id.* at 44-45. With respect to the State of Gujarat Special Economic

Zone Act, Commerce found that Essar (1) was not eligible to receive benefits because the

legislation "only became operational" during the period of review, *id*. at 45, and (2) the

company's facility located inside the special economic zone was not approved under the program

until after the review period. *Id.* at 46. U.S. Steel and Nucor challenge several aspects of

Commerce's conclusions that Essar did not enjoy benefits under either program.

### a. The Special Economic Zone Act of 2005

First, Nucor alleges that Essar was approved for the Special Economic Zone Act of 2005

on September 28, 2006, and U.S. Steel avers that Essar's financial statements indicate that the

company was eligible for benefits during the period of review. Nucor Br. 5-6; U.S. Steel Br. 17.

A company is eligible to receive benefits under the Act only after it is notified of its eligibility by

the Government of India. Pub. Doc. 48 at 3. Notification to the company signifies that the

enterprise has met all terms and conditions set forth by the Government of India in (1) a "Letter

of Approval" issued to the company by the foreign government prior to notification and (2) the

Act and its implementing regulation. Pub. Doc. 48 at 3. Essar's financial statement clearly

establishes that the company did not qualify for benefits under the program until March 21, 2007,

upon its fulfillment of certain conditions. Pub. Doc. 100 Ex. 1 at 44 n.32, 83 n.22. On October

3, 2006, Essar requested a Letter of Approval for setting up a unit in the special economic zone,

and the company was notified of conditional approval on January 11, 2007, with full

authorization coming in March of the same year. Pub. Doc. 100 Ex. 1 at 44 n.32, 83 n.22.

Therefore, prior to the Government of India's notice dated March 21, 2007, Essar could not have

received a benefit under the Act. That the company submitted a notice of "setting up" on

September 28, 2006, and "commenced operations" on October 27, 2006, Pub. Doc. 100 Ex. 1 at

44 n.32, 83 n.22, does not establish *a fortiori* that Essar was approved for and receiving benefits

under the Act. Because the record makes clear that Essar was not eligible to receive benefits

under the Act during the period of review, U.S. Steel's other arguments on the issue of use, U.S.

Steel Br. 17-18, also fail.

Second, U.S. Steel argues that the EPCGS covers only imports of capital goods and not

other goods and services covered by the Act. U.S. Steel Br. 15-16. U.S. Steel and Nucor cite to

Essar's financial statement to contend that Essar received 1,613,500,000 rupees in duty

exemptions under the Act during the period of review. U.S. Steel Br. 18; Nucor Br. 5-6. The

record establishes that Essar did not use the first two parts of the Act, which concern the duty

free import of goods and services into the special economic zone. Commerce found that the

EPCGS, a separate program that the Department also examined in this administrative review,

accounted for the duty free entry of capital goods imported into the special economic zone.

*Issues and Decision Memorandum* at 44; Pub. Doc. 138 at 2. Commerce also determined that

Essar did not receive a benefit in its consumption of non-capital goods under the Act based on

the company's statement that it did not "use[] *any* excise exemption on [the] domestic

procurement of goods/raw materials or [a] duty exemption on imported raw materials," Pub.

Doc. 138 at 4 (emphasis added), during the period of review.  *Issues and Decision Memorandum*

at 44 ("Essar has supplied necessary information with respect to its non-use during the [period of

review] of other alleged subsidies offered under the [Act].").  Nothing in the record establishes

that Essar's deposit of 1,613,500,00 rupees against custom duties was for the company's

importation of non-capital goods during the period of review.  Pub. Doc. 100 Ex. 1 at 44 n.32, 83

n.22.  Moreover, the payment of these duties by Essar to the Government of India renders moot

the claim that the company received a benefit.[14]  Finally, U.S. Steel and Nucor fail to point to any

evidence on the record that demonstrates that Essar consumed services, let alone received a

benefit under the Act on the consumption thereof, during the period of review.  Commerce

properly determined that Essar did not use this program.

### b.  The State of Gujarat Special Economic Zone Act

The receipt of benefits under the State of Gujarat Special Economic Zone Act is

contingent on the establishment of a special economic zone approved by the Government of India

under the Special Economic Zone Act of 2005.  Pub. Doc. 48 at 14.  The record supports the

agency's conclusion that Essar's unit under the Special Economic Zone Act of 2005 was not

approved by the Government of India until after the period of review in March 2007, Pub. Doc.

100 Ex. 1 at 44 n.32, 83 n.22, and the Department therefore reasonably found that Essar did not

use the program during the period of review.  Finally, U.S. Steel and Nucor's remaining claim –

---

[14] Importantly, the Government acknowledges that "[i]f the duties are refunded at some point in the future, Commerce will be able to examine this possible subsidy in a subsequent administrative review."  Def. Br. 18.

that Essar's statement that the State of Gujarat Special Economic Zone Act "only became

operational" during the period of review does not support a finding of non-use of the program –

lacks merit.  U.S. Steel Br. 19-20; Nucor Br. 7.  Even assuming that the legislation from the State

of Gujarat had legal effect during the period of review, that fact does not overcome the absence

of evidence in the record showing that Essar was eligible to receive benefits under the Special

Economic Zone Act of 2005 during the period of review.  If Essar was not eligible under the

Special Economic Zone Act of 2005, it could not have received benefits under the State of

Gujarat program.  Pub. Doc. 48 at 14.  Commerce properly determined that Essar did not use this

program.

### 3.  The State of Gujarat Captive Ports Program

In the *Final Results*, the Department found that Essar did not use the Captive Ports

Program established by the State of Gujarat.[15]  Commerce based its decision on Essar's response

to the agency's questionnaire on the five new programs, wherein the company stated that (1) it

did not receive rebates on wharfage fees and had paid all of the appropriate fees, and (2) its

Memorandum of Understanding with the Gujarat Maritime Board to be relieved of a portion of

such fees did not yet have effect.  *Issues and Decision Memorandum* at 46-47.  U.S. Steel and

Nucor attack the Department's determination that Essar did not receive rebates on wharfage fees,

focusing their challenge on two other documents submitted by Essar that suggest otherwise.  U.S.

Steel Br. 21-23; Nucor Br. 8-10.  The domestic producers' argument fails.  The Court will uphold

---

[15] The Captive Ports Program promotes the construction of port facilities in the State of Gujarat by (1) offering discounts on state wharfage charges and (2) extending credit for the cost of the capital (including interest) to construct port facilities.  *Issues and Decision Memorandum* at 31.

a determination supported with substantial evidence even if two inconsistent conclusions may be

drawn from evidence on the record. *Thai Pineapple Pub. Co.*, 187 F.3d at 1365; *Novosteel SA*,

25 CIT at 12, 128 F. Supp. 2d at 730. U.S. Steel and Nucor's argument that other documentary

evidence shows Essar received rebates does not undermine Commerce's conclusion based on

Essar's statements. In the relevant document, Essar explained that it has "paid the entire

wharfage amount[s]" to the Gujarat Maritime Board since 2000, Pub. Doc. 138 at 6, and that the

Memorandum of Understanding between the company and the State of Gujarat was not yet

implemented during the period of review. Pub. Doc. 138 at 7. In basing its decision on these

statements, the Department drew a rational connection between the record and its conclusion.

Therefore, the Department correctly found that Essar did not use this program.

### 4. The State of Andhra Pradesh Industrial Policy

Commerce reasoned in the *Final Results* that Essar did not use the State of Andhra

Pradesh Industrial Policy because the company's facility was located in an area of the state that

did not qualify for benefits under the program.[16] *Issues and Decision Memorandum* at 47-48.

---

[16] The State of Andhra Pradesh maintains an industrial policy under which it provides
certain benefits that include: (1) a 25% reimbursement on the cost of land in industrial estates
and development areas; (2) a reimbursement of power at an established rate from April 2005
through March 2006, and continuing for four years thereafter; (3) a 50% subsidy for expenses
incurred for quality certification; (4) a 25% subsidy on "cleaner production measures"; (5) a 50%
subsidy on expenses incurred in plant registration; (6) a 100% reimbursement on stamp and
transfer duties paid for the purchase of land and buildings, and in obtaining financial deeds and
mortgages; (7) a grant of 25% of a certain tax paid, which is applied as a credit against the same
tax owed the following year, for a period of five years from the date production commenced; (8)
an exemption from the Non-Agricultural Land Assessment ("NALA"); (9) a provision of
infrastructure on an industry located more than 10km from existing industrial estates or
development areas; and (10) guaranteed stable prices of municipal water for three years for
industrial use and a reservation of 10% of water for industrial use for existing and future projects.
*Issues and Decision Memorandum* at 29-30.

The Department relied on a document submitted by Essar which indicated that the company's facility was located "in the municipal corporation limits of" Visakapatnam, Pub. Doc. 138 at 9, and that "benefits are not available to facilities established in" Visakapatnam. Pub. Doc. 138 at 8. The Department's reliance on those statements established a rational connection between the record and the conclusion the agency reached.

Similarly, no record evidence supports U.S. Steel and Nucor's claim that Essar received a benefit under this program as a result of a slurry pipeline located in the state. U.S. Steel and Nucor contend that the Department did not address their arguments about a slurry pipeline partly located in Andhra Pradesh that stretches over 267 kilometers and connects Essar's Visakapatnam plant to another company facility in Chattisgarh. Pub. Doc. 196 Ex. 1 at 1. The domestic interested parties claim that Essar received a benefit because of this slurry pipeline. U.S. Steel Br. 24; Nucor Br. 10-11. Even assuming the pipeline existed in a benefit-eligible region of Andhra Pradesh, U.S. Steel and Nucor cite to no evidence that shows that Essar actually received a benefit during the period of review as a result of the pipe. Existence of the slurry pipeline does not alone prove that the company received a benefit under the program, an element that must be proved for Commerce to impose a countervailing duty on subject merchandise produced by a foreign company. § 1677(5)(B). Therefore, Commerce properly determined that Essar did not use the program.

U.S. Steel and Nucor also point to Essar's statements regarding the (1) stamp and transfer duty reimbursements and (2) NALA exemptions as evidence that the company received countervailable subsidies under the program. U.S. Steel Br. 23-24; Nucor Br. 10-11. With

respect to NALA, Essar states that it paid the assessment, Pub. Doc. 138 at 11, and the

Department rationally relied on those statements in reaching its conclusion that Essar did not use

the program.  However, on the issue of stamp and transfer duty reimbursements, the Government

acknowledges, but does not admit, that Essar's response suggests use of the program and asks for

a voluntary remand since it did not address this matter in the *Final Results*.  Def. Br. 24; *see* Pub.

Doc. 138 at 10.  The Federal Circuit has held that the Court may grant a request for voluntary

remand when Commerce states that it wishes to reconsider its previous position without

admitting error.  *See SKF USA Inc.*, 254 F.3d at 1029.  Because the Court affords deference to

Commerce's expertise in the countervailing duty arena, *see Fujitsu Gen. Ltd.*, 88 F.3d at 1039,

especially when the agency has yet to analyze the data on a particular issue, the Government's

request is granted so that Commerce may determine whether Essar received stamp and transfer

duty reimbursements under the Industrial Policy of the State of Andhra Pradesh.

### 5.  The State of Chhattisgarh Industrial Policy

The Department determined in the *Final Results* that Essar had not yet acquired the land

on which to build a new facility and, thus, the company could not have used the State of

Chhattisgarh Industrial Policy during the period of review.[17]  *Issues and Decision Memorandum*

---

[17] The Industrial Policy of the State of Chhattisgarh provides subsidies to companies operating in certain areas of that state, including:  (1) a direct subsidy ranging from 35% of the total capital costs of a project, up to a maximum amount equivalent to the sum of commercial and central sales taxes paid during a seven year period; (2) a direct subsidy of 40% of the total interest paid over five years on loans and working capital for upgrades in technology; (3) the reimbursement of 50% of expenses incurred for quality certification; (4) the reimbursement of 50% of expenses for obtaining patents; (5) a total exemption from electricity duties for a period of 15 years from the date commercial production commenced; (6) an exemption from stamp duties on deeds executed for the purchase or lease of land and buildings, as well as deeds relating to loans and advances made by a company over a three year period beginning on the date of

at 48-49.  However, the United States requests a voluntary remand to consider whether Essar's

iron ore benefication plant benefitted from the program, an analysis the Department did not

perform in the *Final Results*.  Def. Br. 25.  The court grants the Government's request so that the

Department may consider the potential benefits conferred on Essar and its benefication plant by

the Industrial Policy of the State of Chhattisgarh during the period of review.  *See SKF USA Inc.*,

254 F.3d at 1029; *see also Fujitsu Gen. Ltd.*, 88 F.3d at 1039.

## IV.  Conclusion

For the foregoing reasons, the court SUSTAINS the Department's calculation of the

benchmark prices for iron ore lumps and fines used in the price comparison to determine whether

the Government of India received less than adequate remuneration in its sales of those goods to

Essar.  The court SUSTAINS the agency's analysis of the government price used in that price

comparison, except as ordered below.  The court SUSTAINS the Department's decision not to

apply facts otherwise available or adverse inferences in its determination of whether Essar

benefitted from certain national and state programs in India.  Finally, the court SUSTAINS

Commerce's finding that Essar did not use certain national and state programs in India, except

that the Department must address on remand only the particular issues listed in this Order.

Accordingly, it is hereby

---

registration; (7) an exemption from the payment of "entry tax" for seven years (excluding any
entry tax payable on minerals obtained from mining within the state); (8) a 50% reduction in
services charges for the Chhattisgarh Industrial Development Corporation's acquisition of private
land for a company; and (9) a discount of up to 100% on the allotment of land in certain
industrial areas.  *Issues and Decision Memorandum* at 30.

**ORDERED** that Plaintiff U.S. Steel's Motion for Judgment Upon the Agency Record is **GRANTED** in part and **DENIED** in part, that Plaintiff Essar's Motion for Judgment Upon the Agency Record is **GRANTED** in part and **DENIED** in part, that Plaintiff-Intervenor Nucor's Motion for Judgment Upon the Agency Record is **GRANTED** in part and **DENIED** in part, and that the case is **REMANDED** to Commerce for further proceedings consistent with this opinion. Specifically, it is

**ORDERED** that Commerce shall adjust the government price for iron ore lumps and fines used in the price comparison to measure the adequacy of remuneration (1) to correct erroneous freight calculations for Essar's purchases of iron ore fines from the NMDC and (2) to account for slurry pipe transportation costs to Vizag in those calculations; it is further

**ORDERED** that Commerce reevaluate whether there is substantial evidence in the record that supports the deduction of the Central Sales Tax from the government price for iron ore lumps and fines used in the price comparison to measure the adequacy of remuneration; it is further

**ORDERED** that, with respect to the Industrial Policy of the State of Andhra Pradesh, Commerce must determine only whether Essar received beneficial stamp and transfer duty reimbursements under the program during the period of review; it is further

**ORDERED** that, with respect to the Industrial Policy of the State of Chhattisgarh, Commerce must determine only whether Essar received benefits under this program during the period of review as a result of its benefication plant; and it is further

**ORDERED** that Commerce shall have until March 31, 2010, to file its remand results with the Court.  Plaintiffs and Plaintiff-Intervenor shall file their responses with the Court no later than April 30, 2010.  The court will not accept reply briefs from any party.  In view of this opinion, the previously scheduled oral argument of February 3, 2010 is hereby adjourned.

Dated:  _December 30, 2009_                                    _____/s/ Judith M. Barzilay___
        New York, New York                                       Judith M. Barzilay, Judge

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____          By: _____
                                                Deputy Clerk